UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

HILLMAN POWER COMPANY, LLC,

                  Plaintiff,                          Case No. 19-CV-11009

v.                                          Honorable Thomas L. Ludington

ON-SITE EQUIPMENT MAINTENANCE, INC.,

                  Defendant.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Hillman Power Company, LLC, ("Hillman") is a biomass electrical power generating plant located in Hillman Michigan. Hillman's facility utilizes a stoker boiler primarily burning wood products. Defendant, On-Site Equipment Maintenance LLC, ("On-Site") is an industrial equipment repair company with its principal place of business located in Edison, New Jersey. The dispute leading to this case arises out of On-Site's effort to repair a steam stop valve for Hillman.

Hillman filed its five count Complaint against On-Site in Montmorency County Circuit Court, alleging claims for breach of contract, negligence, unjust enrichment, fraudulent misrepresentation, and negligent representation. ECF No. 1-1. The case was removed to this Court on April 5, 2019. ECF No. 1. On-Site was permitted to file a counter-claim with leave of Court on October 21, 2019. ECF Nos. 14, 15. On-Site counter-claimed alleging Hillman Power Company's breach of contract. ECF No. 15. On August 17, 2020, Hillman filed a Partial Motion for Summary Judgment and On-Site filed its Cross-Motion for Summary Judgment. ECF No. 39, 40. Responses and replies were timely filed. ECF Nos. 43, 44, 48, 49.

## I.

In the fall of 2017, Hillman hired MD&A[1] to inspect a steam stop valve during a routine maintenance inspection. ECF No. 39-7 at PageID.512. Employees at Hillman had noticed the valve was cracked, but they continued to use it. ECF No. 40-2 at PageID.677. Grant Noll, a Hillman engineer, testified that there were cracks in the valve seat which were concerning, but the "cracks would have to be very extensive before it would cause a hazardous situation." ECF No. 40-4 at PageID.737. Hillman originally planned to replace the valve and budgeted $197,000 for the replacement. ECF Nos. 39-8; 39 at PageID.433.

In August 2018, On-Site's sales manager made an unsolicited phone call to Hillman, most likely to Chase Shepherd, to introduce himself and the company. ECF No. 39-9 at PageID.523. On-Site is owned and run by Mike Leo and his sons Allan, Mark, and Peter.[2] ECF No. 39-3 at PageID.465–66. Mike Leo has worked in the machinery repair business since he was 15 and has run the business since he was 25. *Id.* He did not graduate from high school. *Id.* Mike's son Mark has worked at the family business for about 17 years. ECF No. 40-12 at PageID.773.

Chase Shepherd, the Hillman plant manager, decided that Hillman might be interested in repairing a Gimpel valve and discussed the idea with Mark, the project manager. ECF No. 39-9 at PageID.523. On-Site's e-brochure represents that they repair, recondition, rebuild, and offer new replacement parts for control valves. ECF No. 39-4. They also advertise 24/7 field support with "Satellite Crews For all Major Metropolitan and Extremely Remote Areas, with Coverage to the Entire North America, and to some parts of Canada, Mexico and South America." *Id.* Finally, the

---

[1] MD&A is a turbine repair company. ECF No. 40-2 at PageID.689.
[2] Mike Blancy Leo is the owner's full legal name. ECF No. 39-3 at PageID.465–66. He also uses the name Mike Leonardo (his ancestor's last name before it was later changed), Mike Blancy, Lance Leonardo (Lance is short for Blancy), and his email signature is M. L. Leonardo. However, he only signs legal documents as Mike Leo. *Id.* He has three sons – Allan, Mark (aka Mark James), and Peter Chris Leo (aka Chris Leo). ECF No. 39-6 at PageID.488.

brochure provides, "All work is performed in the United States by highly skilled technicians, engineers and craftsmen with over 30 years experience." *Id.*

On September 14, 2018, Chase Shepherd, completed a Hillman major maintenance purchase request[3] to repair the steam stop valve on the turbine for $40,000. ECF Nos. 39-8 at PageID.519; 40-6. He explained the value "is damaged internally with cracks and poses a risk to the steam turbine if it does not function properly or any steel in the seat or plug breaks loose. A turbine outage due to foreign object damage could mean weeks of downtime and extensive repair cost." ECF No. 39-8. The purchase request states On-Site "will repair the steam valve onsite in a 3-day window. This firm has repaired similar valves for other customers and with positive reference of results. Efforts to find a replacement valve were unsuccessful and repair in a third-party shop was quoted at 5 weeks." *Id.* "The Valve repair was scheduled around Hillman's one-week, pre-planned maintenance outage, beginning on September 28, 2018." ECF No. 39-7 at PageID.513. On-Site knew that Hillman had a scheduled outage and that the plant would be shutdown during the valve repair. ECF No. 39-3 at PageID.472.

On-Site removed the Valve on September 28, 2018. ECF No. 39-7 at PageID.513. When On-Site employees came for the valve, they noticed it had a "makeshift [ ] homemade system" to catch leaking oil and it appeared the valve had not "been serviced in a long time." ECF No. 39-3 at PageID.477. Throughout the repair process in New Jersey, On-Site kept Hillman apprised of additional valve repairs during daily phone calls. ECF No. 39-26; ECF No. 40-3 at PageID.732; ECF No. 39-3 at PageID.470. Despite Hillman's questions about a return date, On-Site "told them that . . . we were going around the clock as fast as it could be done. . . . [W]e never was [sic] able to give a definitive answer until it went out." ECF No. 39-6 at PageID.490. Mark Leo explained

---

[3] This appears to solely be an internal document.

that On-Site never promised a return date for the valve because "[t]he repairs is unpredictable, especially with stellite[4] repairs and this particular metals and parts, and the repairs that we do could be unpredictable in the process. We gave them . . . a range what we expected to see on each part we were repairing." ECF No. 39-3 at PageID.472–73 [sic throughout].

### A.

On-Site prepared a quote on August 31, 2018 for the valve, with an estimated cost of $17,200. ECF No. 39-13. The "workscope" was defined as follows

> *disassemble *remove all valve components *remove packing from bonnet *clean valve components *inspect valve components *record all sizes and clearances *re-pack *clean and de-burr all hardware (replace as needed) *scrape and polish gasket areas *lap seats *blue check all seating surfaces[5] *NDT body[6] *provide tooling[7] *provide transportation for valves in-bound[8] *inspect actuator *replace actuator soft-goods  *test actuator  *provide as found report of all findings *furnish workscope to repair findings/damages
>
> All parts/soft-goods replaced will be billed at additional cost.

*Id.* at PageID.535. A September 10, 2018 email from On-Site to Chase Shepherd provides "[i]n addition to the inspection cost, seat repair can range from 8,k to 30,k depending on the condition. After inspection is complete, actual cost will be furnished." ECF No. 40-11; 39-3 at PageID.468. On-Site first attempted to repair the valve seat prior to replacing it. ECF No. 39-3 at PageID.469.

The first purchase order was issued by Hillman on September 14, 2018 for a cost of $25,200. ECF No. 40-14. The initial and revised purchase orders include a signature from an

---

[4] "Trademark any of various alloys containing cobalt, chromium, carbon, tungsten, and molybdenum: characteristically very hard and wear-resistent, they are castings or hard surface-coatings." *Stellite*, Dictionary.com, https://www.dictionary.com/browse/stellite (last visited 12/21/2020).
[5] "It's a dye to check to make sure that the surfaces are mating or touching." ECF No. 39-3 at PageID.470.
[6] "That is a non-destructive test which we do to check for cracks and stuff like that, porosities, cracks." ECF No. 39-3 at PageID.470.
[7] "Provide tooling means any tooling that we need to repair the parts or get the job done, that's included." ECF No. 39-3 at PageID.470.
[8] This only applies to transport to On-Site's shop and does not include return shipping. ECF No. 39-3 at PageID.470.

unidentified person. The purchase order included $17,200 for disassembly and inspection and $8,000 for repairs. *Id.* It also provides "repairs not to exceed $30,000." *Id.* On September 28, 2018, the valve had been fully removed and shipped to On-Site in New Jersey. ECF No. 40-16. An internal Hillman report attached to an email dated October 3, 2018 indicated that the valve was expected "back on site sometime Monday, Tuesday at the latest." *Id.* at PageID.809. On October 1, 2018, Hillman and On-Site had a phone call where the initial estimate for the seat repair ($8,000 to $30,000) was revised to $37,000. Hillman was also informed that the valve stem needed to be repaired for $12,000[9] and "additional pricing for bodywork and actuator work" would be forthcoming, but were not expected to be substantial. ECF No. 39-7 at PageID.514.

An October 2, 2018 purchase order[10] prepared by Hillman (second purchase order) indicated that repairs would be $66,700—$17,200 for disassembly and inspection, $37,000 for repairs, and $12,500 for valve stem repair. ECF No. 39-20 at PageID.554. However, later that day, On-Site informed Hillman that bodywork would cost $86,400 and it would be an additional $72,000 to rebuild the actuator. ECF No. 39-7 at PageID.514. Chase Shepherd expressed frustration with the new expense estimates and Grant Noll requested that photos of the newly found damage be furnished. ECF No. 40-18. An updated purchase order was completed by On-Site the same day at 2:33 PM (third purchase order) to reflect the bodywork and actuator costs, for a total of $225,100.00. ECF No. 39-21. The purchase order included $17,200 for disassembly and inspection, $37,000 for repairs, $12,500 for valve stem repair, $86,400 for body repairs, and $72,000 for actuator repairs. *Id.*

On October 3, 2018, On-Site employees informed Shepherd during a phone call that "a new disk, strainer, bonnet, and bushings were needed at a cost of $46,000, bringing the total cost

---

[9] In all other evidence in the record, the valve stem repair costs $12,500.
[10] This purchase order was issued at 11:09 AM.

to $271,100." ECF No. 39-7 at PageID.514; ECF No. 40-19 at PageID.821. On October 3, 2018, a fourth purchase order was prepared by On-Site and includes a note, "expected final price + shipment to plant on October 6." ECF No. 39-22. The purchase order included $17,200 for disassembly and inspection, $37,000 for repairs, $12,500 for valve stem repair, $86,400 for body repairs, $72,000 actuator repairs, $19,500 for new disk, $2,400 for strainer, $5,600 for bonnet, and $18,500 for bushing for a total of $271,100. *Id.*

On October 5, 2018 Hillman was informed that the bonnet studs were broken and in need of repair. ECF No. 39-19 at PageID.551. Mike Leo explained that On-Site noticed the stud damage later in the process "[b]ecause it's underneath the surface and we couldn't really see it till we started working on the body. The cracks were underneath the surface." ECF No. 39-3 at PageID.473. A fifth revised purchased order was issued on October 9, 2018 to include the bonnet stud cost for a total of $345,100. ECF No. 39-25. Grant Noll averred in an affidavit that the purchase order was authorized "under duress due to On-Site's refusal to release the Valve and in reliance upon On-Site's continued representations as to the necessity of the repairs and its ability to timely perform them." ECF No. 39-19 at PageID.551; ECF No. 40-21. The balance of the repair, less a 10% hold-back, was required prior to On-Site's shipment of the valve. ECF No. 39-19 at PageID.551–52. The fifth purchase order included $17,200 for disassembly and inspection, $37,000 for repairs, $12,500 for valve stem repair, $86,400 for body repairs, $72,000 for actuator repairs, $19,500 for new disk, $2,400 for strainer, $5,800 for bonnet, $18,500 for bushing, and $74,000 for bonnet stud replacement. ECF No. 39-25. The notes indicate that $243,990 was paid in October. *Id.* The remaining total owed at the time was $101,110. *Id.* On October 17, 2018, On-Site invoiced Hillman for $18,500 for an emergency repair to bolt holes in the actuator housing. ECF No. 40-29.

The sixth and final Hillman purchase order dated October 15, 2018 reflects a total cost of $363,600, including $17,200 for disassembly and inspection, $37,000 for repairs, $12,500 for valve stem repair, $86,400 for body repairs, $72,000 for actuator rebuild, $19,500 for new disk, $2,400 for strainer, $5,600 for bonnet, $18,500 for bushing, $74,000 for bonnet stud replacement, and $18,500 for actuator oil tank repair. ECF No. 40-31.

Chase Shepherd stated in his affidavit that Hillman "believed we had no choice but [to] issue a purchase order reflecting On-Site's inflated costs to ensure we could resume operations in a timely manner." ECF No. 39-7 at PageID.515. Throughout the process, Shepherd and other Hillman employees continued to lose faith in On-Site's willingness and capability to repair the valve. *Id.* However, Grant Noll testified that Hillman had no reason to doubt On-Site's representations that the valve needed more repairs than originally anticipated. ECF No. 40-4 at PageID.739.

## B.

In early October 2018 as On-Site's repair period continued to be extended, Shepherd considered purchasing a valve from another supplier if On-Site could not complete the valve repairs. ECF No. 40-22; ECF No. 40-2 at PageID.686. Grant Noll wrote in an email response that "If we can find another valve we will have some leverage on them to send our valve back in good working condition before we pay. If they refuse then we have a decision to make." ECF No. 40-24.

On October 11, 2018 Shepherd reached out to Tetrad Services about the possibility of purchasing a used valve. ECF No. 39-27; ECF No. 40-2 at PageID.687. Hillman was required to pay for shipping, but was not obligated to purchase the valve. ECF Nos. 39-27; 39-28; 39-7 at PageID.516. A purchase order was completed on October 16, 2018 between Hillman and Tetrad

for $20,500. ECF No. 39-29. The purchase order reflects that one way shipping was $18,000 and a restocking and inspection fee was $2,500. *Id.* The notes indicate "[i]f Hillman Power keeps the valve a second [purchase order] will be sent for $150,000 to purchase the valve and if the valve is returned Hillman Power will pay return shipping." ECF No. 39-29.

Shepherd averred that "[a]fter repeated delays and unclear communication from On-Site, I arranged to have a replacement valve from Tetrad shipped to Hillman with the option to purchase the Valve if needed due to On-Site's repeated extortionate demands that Hillman ma[d]e in advance payments to avoid On-Site stopping work or delaying shipment." ECF No. 39-7 at PageID.516. On October 15, 2018, Shepherd emailed that they "are in good shape to install the [Tetrad] valve if it gets here first and we decide that's the direction we want to go." ECF No. 40-26. On the same day, he also prepared a purchase order for $18,500 for a tank repair with On-Site. *Id.*

> On October 17, 2018, Tetrad informed Hillman of the following,
>
> Since this is being hotshot delivered I would expect the valve would be installed ASAP.
> I would expect you would ship the valve back 7 days from when the valve is delivered to you if you do not install it. It can be shipped just standard.
> If valve is not shipped in that time frame the valve is to be purchased by Hillman Power Company for the quoted price $ 150,000.00.

ECF No. 40-28. Delivery of the Tetrad valve was to "hedge the risk of the valve coming from On-Site not working." ECF No. 40-13 at PageID.799. Shepherd testified "[t]he idea was to install whichever valve [Tetrad or On-Site] showed up first to stop the business interruption." ECF No. 40-2 at PageID.726.

## C.

On-Site did not fully test Hillman's valve in New Jersey because it had to be installed prior to completion testing. ECF No. 39-6 at PageID.494. However, components of the valve were

tested. *Id.* "On October 18, 2018, the Valve and installation crew from On-Site arrived at the Hillman Plant at 9:00 p.m., unloaded the Valve, and worked overnight to install it by the early morning of October 19, 2018." ECF No. 39-7 at PageID.516. Chase Shepherd also averred that On-Site did not provide start-up assistance with the valve. *Id.* On-Site installed the valve and bolted the flanges to the unit, but Mike Leo testified that On-Site did not provide start-up assistance because Hillman had its own people to finish the adjustments. ECF No. 39-3 at PageID.476.

In an affidavit, Shepherd asserted that "[a]fter the Valve was installed and the Plant turbine was started, I observed that the valve would move about a half-inch and never enough to get the backseat seated." ECF No. 39-7 at PageID.516. "[T]he Valve would not operate properly and was leaking steam profusely from the Valve bonnet." *Id.* Shepherd averred that he attempted to contact Mark Leo on October 19, 2018, but his call was not returned until October 21, 2018 and that On-Site could not provide support at the plant in Hillman until the following week. *Id.* at PageID.517.

On October 21, 2018 Hillman emailed On-Site and explained they "are still unable to make the stop valve operate properly" and "[i]t only moves about a half inch." ECF No. 39-31. A second email was sent on October 30, 2018. ECF No. 39-32. Shepherd explained that the valve

> tried to actuate but seemed to be stuck on the steam side of the valve and wouldn't move. It was also stuck off the seat so getting close to it to work on it wasn't a safe option and the valve was removed. After it was removed it was noted that the bonnet had been leaking around the top.

ECF No. 39-32. He also inquired about the warranty service for the valve. ECF No. 39-32. The same day, On-Site responded and requested Hillman send the valve back to On-Site "at your earliest convenience in order that we may inspect and do what is necessary to get your valve back in inventory." ECF No. 39-32.

MD&A personnel arrived at Hillman on October 23, 2018 in an effort to troubleshoot concerns with the valve. After an inspection,

- 9 -

> It was concluded that the problem lay with the valve proper – i.e., that the actuator and hydraulic elements of the assembly were operating properly, and that binding, or interference was occurring between the valve stem, and some component of the valve itself, such as the pressure seal head.

ECF No. 39-2 at PageID.461. "After consultation with plant and MD&A management it was decided to move forward with the replacement of the entire shop valve/actuator assembly with the refurbished assembly from [Tetrad]." ECF No. 39-2 at PageID.461.

Hillman was never able to get the On-Site valve working properly. ECF No. 40-2 at PageID.710.

### D.

The Tetrad valve arrived on October 18, 2018. EF No. 40-32. On October 23, 2018, it was decided that the On-Site valve would be removed and replaced with the Tetrad valve to get the plant operating. ECF No. 40-40. Grant Noll explained that "We can decide later if we send it back to On-Site under warranty or choose someone else we can trust as competent." *Id.* The hope was to have On-Site present for the removal, but they were not available. ECF No. 40-41.

The Tetrad valve did not function properly when it initially installed. Therefore, Hillman used parts from On-Site's valve and Tetrad's valve in an attempt to make the Tetrad valve operational. Shepherd does not remember if any On-Site parts were used in the final version of Tetrad's valve. ECF No. 40-2 at PageID.714. The purchase price for the Tetrad valve was reduced 10% due to the work necessary to make the valve operational, for a final price of $135,000. ECF No. 40-44.

### E.

The On-Site Warranty was valid for one year. ECF No. 40-46. A copy of a general warranty agreement was included in an email between two On-Site employees. It provides,

- 10 -

All work shall carry a warranty for a duration of not more than 12 months of receiving materials. In some cases where specified, warranty may only be valid for durations of 30, 60, or 90 days. Warranty may cover all work performed under contract/purchase order agreement. Our company guarantees that all materials will be serviced as necessary during the warranty period with no cost to client, regarding all work completed under said contract. Warranty will become null and void in the event that client received and declined recommendations for service on any component, assembly or service work under the same contractual agreement including but not limited to single purchase order or durational contractual agreement. Warranty will become null and void if there is a balance owed on said warranted item. Warranty will become null and void in the event that a third party including but not limited to any unauthorized individual or organization performs any inspection or work on any single component or assembly covered under the warranty. Our company guarantees to perform all warranty work in a timely fashion and all work will be held to the highest industry standards, and our company guarantees to provide the highest quality of service. All claims must be made immediately and no later than 30 days upon discovery of failure. When claim has been made and our company has been informed, materials, component(s), assemblies, must be shipped to designated Repair Facility within 30 days. Warranty may be cancelled if claims submitted items are not returned within 30 days. Warranty may be cancelled if warranty covered item is inspected or serviced by unauthorized party. Warranty only takes effect when warranted item is paid for in full.

ECF No. 40-47. It is unclear from the record when the warranty was shared with Hillman. However, Mark Leo testified that warranty terms are usually provided after the installation of the valve. ECF No. 39-6 at PageID.497.

Mark Leo also testified the warranty "would be void if somebody messed with our valve in the sense that they took apart our valve and inspected our valve by disassembling it, swapping parts out, things of that nature." *Id.* at PageID.498. However, if a third party set the limits and adjusted the valve, that would not void the warranty. *Id.* Under the warranty, Hillman had 30 days to identify a defect and report it to On-Site. *Id.*

Grant Noll testified Hillman didn't return the valve immediately "[b]ecause [Hillman was not] going to give any warranty repair until the final payment was made on the – on the account. They weren't going to honor their warranty until final payment was made on the account." ECF

No. 40-4 at PageID.743. However, Mark Leo testified that On-Site was willing to work with Hillman despite the fact that Hillman had not finished paying for the valve. ECF No. 39-6 at PageID.498.

### F.

Hillman's portfolio controller, Kenny Chan, asserted in an affidavit that Hillman incurred $337,027 in undefined "fixed costs" from September 27, 2018 to October 27, 2018. ECF No. 39-36. Specifically, $230,553 of that sum was from October 6, 2018 to October 24, 2018. *Id.* This does not include the payment to On-Site for the valve of $336,490 and to Tetrad for $153,000. *Id.* To date, Hillman has not paid the remainder of the bill due to On-Site, approximately $27,000. ECF No. 40-49 at PageID.870.

Grant Noll testified the reason Hillman did not pay the remainder of the bill was "because we had already paid way too much to receive a valve that, first, didn't work; but, second, was actually leaking steam. Which to me it – is extremely abnormal for any repairs. It's one thing when the valve won't work. It's another thing that it actually is leaking steam and creating a dangerous situation." ECF No. 40-4 at PageID.741.

Recently, Hillman "signed a new power purchase agreement with Consumers Energy." *Id.* at PageID.734. The agreement requires the plant to be in "stand-by ready mode," that is, "the plant didn't always need to run, but it needed to be available for Consumers Energy in Michigan if it was called upon." *Id.*

### II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the

record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III.

Plaintiff's motion seeks summary judgment on Counts I (breach of contract), III (unjust enrichment), and V (negligent misrepresentation) of its Complaint. ECF No. 39. Defendant's motion seeks summary judgment on all five claims of Plaintiff's Complaint and Count I of its Counter-Complaint. ECF No. 40.

### A.

### i.

"In this Circuit, it is well established that a federal court sitting in diversity applies the standard for a directed verdict used by the courts of the state whose substantive law governs the action." *Am. & Foreign Ins. Co. v. Gen. Elec. Co.*, 45 F.3d 135, 139 (6th Cir. 1995) (quoting *Potti v. Duramed Pharm., Inc.*, 938 F.2d 641, 645 (6th Cir. 1991)). In this case, Plaintiff filed its claim in Montmorency County Circuit Court and Defendant removed it based on diversity. ECF No. 1. Therefore, Michigan law applies to Plaintiff's claims and Defendant's counter-claim.

"In Michigan, the essential elements of a valid contract are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Thomas v. Leja*, 187 Mich. App. 418, 422 (1991). Absent satisfaction of

those elements, mere discussions or negotiations are insufficient to create a contract. *Id.* The

elements for a Michigan breach of contract claim are "(1) there was a contract, (2) the other party

breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank*

*of Am., N.A. v. First Am. Title Ins. Co.*, 878 N.W. 2d 816, 829 (Mich. 2016).

> Michigan law is settled: " 'He who commits the first substantial breach of a contract
> cannot maintain an action against the other contracting party for failure to perform.'
> " *Ehlinger v. Bodi Lake Lumber Co.,* 324 Mich. 77, 36 N.W.2d 311, 316 (1949),
> *quoting Jones v. Berkey,* 181 Mich. 472, 148 N.W. 375, 378 (1914). The
> determining factor in Michigan breach of contract cases and in this case is therefore
> whether a first breach is "substantial." The Michigan Supreme Court has explained
> that a "substantial breach" is one "where the breach has effected such a change in
> essential operative elements of the contract that further performance by the other
> party is thereby rendered ineffective or impossible, such as the causing of a
> complete failure of consideration or the prevention of further performance by the
> other party." *McCarty v. Mercury Metalcraft Co.,* 372 Mich. 567, 127 N.W.2d 340,
> 343 (1964).

*Chrysler Int'l Corp. v. Cherokee Exp. Co.*, 134 F.3d 738, 742 (6th Cir. 1998). Determining whether

a breach is substantial requires a fact-specific analysis. *Id.* at 742. Additionally, "where a contract

expressly includes a notice and cure provision, a party failing to provide such is precluded from

then subsequently suing for the other party for breaching the agreement." *Chrysler Realty Co.,*

*LLC v. Design Forum Architects, Inc.*, 544 F. Supp. 2d 609, 616 (E.D. Mich. 2008). Further,

> "He who commits the first substantial breach of a contract cannot maintain an
> action against the other contracting party for failure to perform." The determining
> factor in Michigan breach of contract cases . . . . is therefore whether a first breach
> is "substantial." The Michigan Supreme Court has explained that a "substantial
> breach" is one "where the breach has effected such a change in essential operative
> elements of the contract that further performance by the other party is thereby
> rendered ineffective or impossible, such as causing of a complete failure of
> consideration of the prevention of further performance by the other party."

*Chrysler Realty Co., LLC v. Design Forum Architects, Inc.*, 544 F. Supp. 2d 609, 616 (E.D. Mich.

2008) (quoting *Chrysler Int'l Corp. v. Cherokee Expert Co.*, 134 F.3d 738, 742 (6th Cir. 1998)).

> In the usual contract to repair, the law implies an undertaking to perform the work
> in a reasonably skillful and workmanlike manner. But it does not follow that an
> artisan must answer in damages for anything which may later go wrong with an

article or mechanism he has undertaken to repair. *Liability can only be imposed upon him when it is shown that he used improper methods or defective materials or was otherwise guilty of a breach of his implied warranty.*

*Jinkner v. Rose Bowl Lanes, Inc.*, 157 N.W.2d 317, 321 (Mich. Ct. App. 1968) (quoting *Bellman Heating Co. v. Holland*, 86 A.2d 526, 526 (Mun. Ct. App. DC 1952)) (emphasis added).

A plaintiff may bring a breach of contract claim premised on alleged violations of good faith and fair dealing, as long as the violations relate to defendant's discretionary actions to fulfill the terms of the contract. *Brimm v. Wells Fargo Bank, N.A.*, 688 Fed. Appx. 329, 331 (6th Cir. 2017) ("Michigan recognizes an implied covenant of good faith and fair dealing only when one party 'makes the manner of its performance a matter of its own discretion.'" (quoting *Burkhardt v. City Nat'l Bank of Detroit*, 226 N.W.2d 678, 680 (1975))); s*ee also 5504 Reuter, LLC v. Deutsche Bank Nat. Tr. Co.*, 2014 WL 7215197 at *4 (Mich. Ct. App. Dec. 18, 2014) ("In order to succeed on a breach of contract claim, plaintiff would need to show a breach of the terms of the contract itself; it cannot premise a breach of contract action on a breach of the implied duty of good faith and fair dealing.").

### ii.

Both parties agree that the six purchase orders constitute a contract between the parties, notwithstanding the increasing prices for remediation of the valve and the notable absence of a fixed date for the completion of On-Site's services. ECF No. 39 at PageID.445–46; ECF No. 40 at PageID.642. Therefore, the question is which of the two parties, if any, was first in substantial breach of the contract and if so, what the consequential damages are.

In its Motion for Summary Judgment, Hillman argues that On-Site breached the contract "by failing [to] properly perform the work Hillman paid for and by delivering the inoperable Valve." ECF No. 39 at PageID.446. It explains On-Site breached the common law duty to perform the repair with "care, skill, reasonable expediency and faithfulness [to] the thing agreed to be

done." *Id.* (internal quotes omitted). Further, it argues, On-Site failed to furnish a workscope of the damage to the valve and instead "provided piecemeal updates over the span of three weeks, identifying several additional repairs that should have been identified and included within its initial estimate." ECF No. 39 at PageID.447. Also, On-Site failed to test the valve to determine if it functioned properly before returning it back to Hillman. *Id.*

In response, On-Site incorporates its argument from its Motion for Summary Judgment. ECF No. 44 at PageID.939. On-Site's motion argues that Plaintiff "cannot raise a question of material fact that Defendant breached the contract, where the Plaintiff also committed spoliation by tampering with the valve itself prior to any competent testing or inspection being undertaken on it." ECF No. 40 at PageID.646–47. Finally, it explains that, in contrast to Plaintiff's claims that it failed to timely deliver the valve, "[n]one of the purchase orders, certainly not the final order from October 17, contain a date certain, or any date for that matter, for shipment." *Id.* In the response itself, On-Site argues that "Hillman cannot establish that there is anything wrong with the valve [On-Site] repaired . . . . [T]he problems Hillman encountered post-reinstallation of the valve had everything to do with start-up adjustments and calibration of the valve to the plant's system. . . . Furthermore, providing start-up adjustments was not a task Hillman ever contracted [On-Site] to perform." ECF No. 44 at PageID.939–40. Second, On-Site argues Hillman breached the contract because it failed to pay the remainder of the contract. *Id.*

In reply, Hillman contends that On-Site's employees are not experts, the "cursory inspection of the Valve could not determine whether the Valve functioned or whether adjustments would have cured the defective condition," and On-Site did not fully test the valve prior to shipment. ECF No. 49 at PageID.1044. It also contends that even though a specific date was not

stated, On-Site did provide an estimated amount of time for the repair, including multiple purchase orders that include expected shipment dates. *Id.* at PageID.1046–47.

Hillman's argument that there is no genuine dispute of fact—that On-Site breached the purchase order contract by failing to repair the valve—is without merit. On-Site conducted daily phone calls with Hillman employees and updated them about the damage to the valve as it was learned. Grant Noll testified that he had no reason to dispute the necessity of the repairs that On-Site kept finding as the valve was disassembled. Hillman also had its employees working around the clock. On-Site's assertion that the damage was simply more extensive than expected and accordingly more expensive and required additional time to repair than initially estimated reflects a legitimate dispute of fact. Hillman's only evidence of On-Site's failure to perform the repair with care and skill is the fact that the valve did not perform after installation at Hillman's plant. It is undisputed that the valve did not perform as expected once it was installed. However, Hillman has not advanced any evidence explaining why the valve did not perform after installation. It could have been Hillman's employees incorrectly adjusting the valve. It also could have resulted from damage that On-Site caused to the valve during the repairs. Hillman's Motion for Summary Judgment on the breach of contract claim under a theory of failure to repair the valve correctly will be denied because there is a genuine question of material fact regarding the cause of the valve's inoperability.

Hillman also argues that On-Site never provided a single workscope of the valve's damage prior to starting repairs as required in the contract. The contract provided a workscope would be provided, but did not specify how. Nevertheless, Hillman and On-Site participated in daily phone calls discussing the progress of the repair. The workscope may not have been provided in a single written document, but Hillman was informed of the necessity of the repairs, the cost, and expected

time needed to conduct them throughout the process. It has not identified any evidence that information was hidden from them. In addition, On-Site argues that it kept finding further damage the more it disassembled the valve. Hillman does not dispute this fact nor does it argue that On-Site could have determined the full extent of the damage earlier in the process. Hillman's argument that On-Site breached the contract on the theory of failing to provide a workscope, as a matter of law, is equally unpersuasive.

Finally, Hillman argues that On-Site failed to test the valve prior to returning it to Hillman. However, On-Site tested parts of the valve prior to shipping the valve and Mark Leo testified the entire valve could not be tested until it was installed at the plant. Hillman provides no evidence that On-Site contracted to fully test the valve prior to shipment. Additionally, there is evidence of a warranty on the valve and emails from On-Site communicating their willingness to repair the valve, even if the timeframe for the warranty was longer than Hillman expected. On-Site's failure to fully test the valve prior to shipment is not sufficient to support their Motion for Summary Judgment on the breach of contract claim.

Hillman obviously is displeased with the result of the $360,000 investment in the repair of its valve when it purchased a used replacement valve for half the repair price. However, there is a material question of fact regarding the cause of the valve's inoperability. Therefore, Hillman's Motion for Summary Judgment for breach of contract will be denied.

### iii.

In its own motion, On-Site also seeks summary judgment on its counterclaim for breach of contract. It claims Hillman breached the contract by 1) "failing to pay the entire balance owed to the Defendant" and 2) "by breaking off contact pertaining to warranty work (or voiding the

warranty outright) and failing to allow Defendant a reasonable time to cure any alleged defects with the rebuilt valve." ECF No. 40 at PageID.643–44.

The second argument will be addressed first. Hillman's employees admit they removed parts from On-Site's valve and placed them into the Tetrad valve in order to make the Tetrad valve operable. Even though it is unclear if the Tetrad valve currently has any remaining On-Site parts, parts were removed from the On-Site valve, without authorization from On-Site. While Hillman may have invalidated the warranty, this is not evidence of Hillman breaching the underlying contract for the repair valve as a matter of law.[11]

Regarding On-Site's first argument, it is undisputed Hillman has not paid the outstanding balance, about $27,000. Hillman's best defense to this argument is that On-Site was in material breach for its failure to repair the defective valve prior to its non-payment. As discussed earlier, this remains a question of unresolved fact. Equivalently, there is a genuine issue of material fact as to whether On-Site (for failure to provide an operative valve) or Hillman (for failure to pay) first breached the contract, if at all. For this reason, On-Site's Motion for Summary Judgment on the breach of contract claim will be denied.

**B.**

**i.**

There are four elements to a Michigan negligence claim – "(1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; (3) causation; and (4) damages." *Case v. Consumers Power Co.*, 615 N.W.2d 17, 20 (Mich. 2000). The Michigan Supreme Court has recognized "that in some instances a breach of a contract may give rise to an independent action arising in tort when there is a breach of duty which is distinct from the breach of contract."

---

[11] At the same time, it may be evidence of Hillman's unwillingness to allow On-Site to cure a potential defect in the valve and therefore be relevant to Hillman's breach of contract claim.

*Brewster v. Martin Marietta Aluminum Sales, Inc.*, 378 N.W.2d 558, 667 (Mich. Ct. App. 1985); *Hart v. Ludwig*, 79 N.W.2d 896, 898 (Mich. 1956).

The Michigan Supreme Court has explained the "duty element questions whether an actor has a legal obligation 'to so govern his actions as not to unreasonably endanger the person or property of others.'" *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 177 (Mich. 1993) (quoting *Clark v. Dalman*, 150 N.W.2d 755, 760 (Mich. 1967)). "To require the actor to act, some sort of relationship must exist between the actor and the other party which the law or society views as sufficiently strong to require more than mere observation of the events which unfold on the part of the defendant. It is the fact of existence of this relationship which the law usually refers to as a duty on the part of the actor." *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 178 (Mich. 1993) (quoting *Samson v. Saginaw Prof'l Bldg. Inc.*, 224 N.W.2d 843, 849 (Mich. 1975)). "In determining whether a duty exists, courts examine a wide variety of factors, including the relationship of the parties and the foreseeability and nature of the risk. *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 178 (Mich. 1993). In *Schultz*, the Supreme Court held that Consumers Power had "a duty to reasonably protect members of the general public from any foreseeable danger from its power lines." *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 181 (Mich. 1993). The Supreme Court has also held that manufacturers and wholesalers owe a legal duty to those affected by the use of products that they market. *Moning v. Alfono*, 254 N.W.2d 759, 762 (Mich. 1977).

### ii.

On-Site argues it is entitled to summary judgment on the negligence claim because Plaintiff's claim is not a distinct breach of duty claim from the breach of contract claim. ECF No. 40 at PageID.649. On-Site proffers that "[b]ut for the contract, no relationship would have existed"

- 20 -

between the parties and "[b]ecause one cannot negligently breach a contract, Plaintiff's claim sounds in contract and not tort and its negligence claim fails." *Id.* at PageID.650.

Plaintiff attempts to thread a needle through the exception and provides "while the mere existence of a contract does not itself provide a basis for a duty of care to a third party in tort, the existence of a contract also does not extinguish duties of care otherwise existing." ECF No. 43 at PageID.899. Plaintiff contends after On-Site was hired to repair the valve, "[i]t was foreseeable that Hillman's property could be damaged by On-Site's negligent actions." ECF No. 43 at PageID.900. It argues "it would be prudent, sound policy for this Court to reinforce common negligence principles to prevent one hired to perform repairs from wrongly assuming their contract extinguishes any legal duty to avoid damage to the other's property." ECF No. 43 at PageID.900. There is no legal authority to support this argument. Hillman entered into a contract to repair the valve. The duty to exercise skill and good faith during the repair is presumed under Michigan contract law. Defendant's Motion for Summary Judgment on the negligence claim will be granted.

## C.

### i.

Unjust enrichment "is the equitable counterpart of a legal claim for breach of contract." *AFT Michigan v. Michigan*, 846 N.W.2d 583, 599. "Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." *Id.* (quoting *McCready v. Shields*, 52 N.W.2d 853, 855 (Mich. 1952)). "The elements of a claim for unjust enrichment are (1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to plaintiff from defendant's retention of the benefit." *Bellevue Ventures, Inc. v. Morang-Kelly Investment, Inc.*, 836 N.W.2d 898, 901 (Mich. Ct. App. 2013) (citing *Dumas v. Auto Club Insurance Association*, 473 N.W.2d 652, 663 (Mich. 1991)). "However, a contract will be implied

only if there is no express contract covering the same subject matter." *Id.* "Conversely, where there are questions of fact concerning the existence and terms of the contract, a claim for unjust enrichment can be maintained." *Fodale v. Waste Management of Michigan, Inc.*, 718 N.W.2d 827, 841 (Mich. Ct. App. 2006). "Rule 8(a)(3) permits pleadings in the alternative when, for instance, there is a dispute between the parties as to whether an express agreement exists." *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 796 (6th Cir. 2016) (internal quotations and citations omitted).

**ii.**

Hillman argues On-Site has been unjustly enriched because it was paid $336,490 for the repair. ECF No. 39 at PageID.452. Hillman outlines the factors for an unjust enrichment claim, but does not explain how it can allege both a breach of contract claim and an unjust enrichment claim premised on the same facts, except for one reference to *Fodale* that an unjust enrichment claim can be brought when there are factual questions regarding the terms of the contract. *Fodale v. Waste Management of Michigan*, 718 N.W.2d 827, 841 (Mich. Ct. App. 2006). Hillman argues

> On-Site took Hillman's Valve, took Hillman's money, and returned the Valve in an inoperable condition. Hillman admits the Valve was in need of repair prior to On-Site's work—but at least it functioned. On-Site returned a very heavy paperweight or boat anchor and made off with $336,490. It would be inequitable for it to retain that benefit.

ECF No. 39 at PageID.453–54.

In its response, On-Site incorporates its argument seeking denial of the unjust enrichment claim from its own Motion for Summary Judgment. ECF No. 44 at PageID.945. It contends that the claim for unjust enrichment fails because there was a valid express contract covering the terms of the agreement, a matter earlier conceded by both parties. ECF No. 40 at PageID.651–52.

Similar to the negligence claim, Hillman fails to articulate any factual questions regarding the terms of the contract. Instead, it repackages its breach of contract argument with a different

title. While it may be inequitable for On-Site to retain $336,490 for returning an inoperable valve, the parties' contractual terms control the result of this dispute. Hillman does not articulate any contractual terms that are in dispute. Hillman's Motion for Summary Judgment on the unjust enrichment claim will be denied and On-Site's Motion for Summary Judgment on the unjust enrichment claim will be granted.

**D.**

**i.**

There are six elements a plaintiff must establish to prevail on a Michigan fraudulent misrepresentation claim,

> 1. The defendant made a material misrepresentation. 2. The representation was false. 3. When the defendant made the representation, it knew that it was false, or the defendant made the representation recklessly, without any knowledge of its truth, and as a positive assertion. 4. The defendant made the representation with the intention that it should be acted on by the plaintiff. 5. The plaintiff acted in reliance on the representation. 6. The plaintiff suffered injury due to his reliance on the representation.

*Hord v. Envtl. Research Inst. of Mich.*, 617 N.W.2d 543, 546 (Mich. 2000). "Plaintiff must also show that any reliance on defendant's representations was reasonable." *Foreman v. Foreman*, 701 N.W.2d 167, 175 (Mich. Ct. App. 2005).

**ii.**

On-Site moved for summary judgment on Plaintiff's fraudulent misrepresentation claim. Hillman's Complaint alleges that "On-Site represented to Hillman that it possessed the skill and expertise required to repair and install the Valve," and "represented that the Valve required additional repairs beyond the repairs necessary to maintain its working conditions," and "On-Site's representations were made with the intention to induce Hillman to rely upon the representations,

enter into the contract, and transfer funds to On-Site to secure its property." ECF No. 1-1 at PageID.15.

In its motion On-Site argues that the valve was old and worn and had greater damage than expected based on the photos. ECF No. 40 at PageID.652–53. It argues that Hillman "may now believe that the additional repairs were unnecessary" but "it has no evidence of that beyond its own belief." *Id.* Further, even if there were evidence that certain repairs were unnecessary, On-Site "did not represent additional repairs were necessary in bad faith or recklessly," nor that the valve would be returned by a date certain. *Id.* at PageID.653–54.

In response, Hillman contends that On-Site's advertising materials state that it had experts and engineers serving North and South America, employed highly skilled individuals with over 30 years experience, and upgrades could be completed within the customer's desired timeframe. ECF No. 43 at PageID.903–04. Hillman explains On-Site is actually a small shop run by family members who did not graduate high school and lack skilled trades certificates. *Id.* Further, it maintained On-Site represented that it could repair the valve, but did not. *Id.*

Despite Hillman's frustration with the total cost of the repairs for the non-functioning valve, Defendant's assertions do not rise to the level of fraudulent misrepresentation. "An action for fraud may not be predicated upon the expression of an opinion or salesman's talk in promoting a sale, referred to as puffing." *Van Tassel v. McDonald Corp.*, 407 N.W.2d 6, 8 (Ct. App. Mich. 1987). Hillman acknowledges that On-Site explained the discovery of the need for additional repairs was the reason for the extended total repair timeframe. The most prominent exaggeration on the e-brochure is the indication that "engineers" were employed by On-Site. While that term is traditionally used by individuals with a bachelor degree in science, it can also more broadly mean "a person who is trained in or follows as a profession a branch of engineering" or "a person who

carries through an enterprise by skillful or artful contrivance." *Engineer*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/engineer (last visited 12/4/2020). The exaggerations, if any, included in the e-brochure do not rise to the level of a false, material misrepresentation.

As for On-Site's representation that it could repair the valve when it returned an inoperable "paper weight," the record demonstrates the absence of evidence of a false or material misrepresentation. Hillman's own Grant Noll testified that he has no reason to believe the additional repairs were unnecessary. There is evidence that On-Site conducted the repairs it said it would and, unfortunately, the valve did not work upon installation. The difficulties with the valve after installation and adjustment do not demonstrate that On-Site employees did not have the ability to repair the valve, let alone that they made any false material misrepresentations with the intention for Hillman to act upon those assertions. Hillman is displeased with the final outcome, but it has not demonstrated any material misrepresentation about On-Site's ability to repair the valve. On-Site's Motion for Summary Judgment on the fraudulent misrepresentation claim will be granted.

## E.

### i.

"A claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Alfieri v. Bertorelli*, 813 N.W.2d 772, 775 (Mich. Ct. App. 2012). "[N]egligent misrepresentation [] ] require[s] a defendant to owe a duty to the plaintiff." *Id.* "Duty is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person." *Estate of*

*Goodwin by Goodwin v. Nw. Michigan Fair Ass'n*, 923 N.W.2d 894, 907 (2018) (quoting *Moning v. Alfono*, 254 N.W.2d 759, 765 (Mich. 1977)).

**ii.**

Hillman argues it relied on "On-Site's misrepresentations regarding its capabilities and expertise prior to hiring On-Site. . . . [Hillman's] reliance on On-Site's statements regarding its qualifications and abilities to perform the Work [on the valve] was reasonable and justified" based upon their requested references, discussion of On-Site's qualifications, and review of its website and brochure. ECF No. 39 at PageID.454. Hillman argues it detrimentally relied upon On-Site's representations because except for On-Site's representations, it

> would not have hired On-Site to perform the work and would not have paid $336,490 for inadequate and improper repairs to the Valve. Moreover, it could have avoided the substantial fixed costs incurred due to On-Site's delay.

ECF No. 39 at PageID.454–55. Finally, Hillman contends On-Site owed a duty to Hillman to "truthfully present its qualifications" because Hillman was a customer. *Id.*

In response, On-Site incorporates its argument included in its own Motion for Summary Judgment on the negligent misrepresentation claim. ECF No. 44 at PageID.945. In its motion, On-Site first posits that "because the duty owed by the Defendant to the Plaintiff sounds entirely in contract rather than in tort, this claim would seem to be precluded." ECF No. 40 at PageID.654. Even if the claim is not precluded, it further explains

> there is no documentary nor testimonial evidence supporting the argument those additional repairs were not noted to Plaintiff or undertaken fraudulently. On the contrary, the testimony showed the valve at issue was old and badly damaged from age and neglect. Additionally, there is no evidence the Plaintiff suffered a detriment by purchasing the additional repairs or that the additional repairs were represented by On-Site without reasonable care.

ECF No. 40 at PageID.654–55. In the response itself, it also explains that

- 26 -

> Hillman's argument pertaining to its negligent misrepresentation count goes far afield from its Complaint . . . [which] only refers to the additional repairs agreed to during the inspection of the valve as the alleged misrepresentations [and ] [l]ikely because there is no documentary nor testimonial evidence that the additional repairs were misrepresented or undertaken fraudulently, Hillman looks elsewhere in its quest to defame the Defendant. . . . [On-Site] was qualified to do the repair and it truthfully presented Hillman with its qualifications.

ECF No. 44 at PageID.946.

Regardless of whether the negligent misrepresentation claim can co-exist with the contractual claim, Hillman's argument that it detrimentally relied upon On-Site's representations fails because it does not establish that On-Site negligently misrepresented its ability to perform the work to Hillman. Grant Noll testified that Hillman has no reason to dispute that the repairs were necessary. Additionally, On-Site kept Hillman apprised of the repairs throughout the process explaining that the delays were caused by On-Site continually finding additional repairs. Finally, as explained previously, On-Site did not misrepresent its qualifications and ability to Hillman. Hillman's Motion for Summary Judgment as to the negligent misrepresentation claim will be denied and On-Site's Motion for Summary Judgment for the negligent misrepresentation claim will be granted.

In summary, Count I of Plaintiff's Complaint and Count I of Defendant's Counter-Complaint remain for resolution by a jury. The important issue(s) of which parties bear the burden of proof on the question of fact will be resolved in preparing the instructions for the jury.

## IV.

Accordingly, **IT IS ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 39, is **DENIED**.

It is further **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 40, is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Counts II, III, IV, and V of Plaintiff's Complaint are **DISMISSED**.


Dated: December 23, 2020                                  s/Thomas L. Ludington
                                                         THOMAS L. LUDINGTON
                                                         United States District Judge